# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

JOHN DOE and JANE DOE,
as parents of and on behalf of their minor child,
RON DOE,

      Plaintiffs,

      v.                                 Case No.  03-C-743

SHOREWOOD SCHOOL DISTRICT,

      Defendant.

---

# DECISION AND ORDER

---

The plaintiffs, John Doe and Jane Doe, as parents of and on behalf of their minor child, Ron Doe, filed this action alleging violations of the federal Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, et seq., and Ch. 115, Wis. Stats.  The plaintiffs seek reimbursement for room, board and medical expenses which they incurred in placing their son at Sonia Shankman Orthogenic School, a residential treatment and educational facility in Chicago, Illinois, from September 5, 2002, through August 2003.  The plaintiffs also seek a continuing remedy, namely reimbursement of room, board and medical expenses from August 2003 to date.  In addition, they also seek a declaratory judgment that the defendant has a continuing responsibility for their son's room, board and medical expenses during his continuing placement at the facility.

Administrative Law Judge (ALJ) Sally Pederson of the Wisconsin Division of Hearings and Appeals conducted the due process hearing on May 6, 7, 8 and 15, 2003.  On June 30, 2003, ALJ Pederson issued her decision denying the plaintiffs' claim for reimbursement for room, board and medical expenses.  The plaintiffs now seek reversal of that decision.

Now pending before this court are the parties' cross motions for summary judgment. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

## UNDISPUTED RELEVANT FACTS[1]

Plaintiffs John and Jane Doe reside together in the Village of Shorewood, Milwaukee County, in the State of Wisconsin. John and Jane Doe are the parents of Ron Doe (Ron), a minor child with learning and emotional behavioral disabilities. Ron was born on March 8, 1987, with a disability in need of special education as defined by state and federal law pursuant to the federal Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, et seq., and Ch. 115, Wis. Stats.

The defendant, Shorewood School District, is a duly incorporated school district and is a recipient of federal funds. The defendant operates under the laws of the State of Wisconsin and is located in the Village of Shorewood, in Milwaukee County.

Ron had attended Shorewood School District schools for a period of time. He then attended private schools outside the district. From February 2001 to February 2002, Ron attended Holy Family Elementary School. In February 2002, he was expelled for disruptive behavior. Ron re-enrolled in the Shorewood School District on February 28, 2002, to complete eighth grade. At that time, his parents met with Dr. Axelrod and Dr. Hanney, the

---

[1]As a general matter, unless accompanied by citation, the relevant facts are taken from the stipulated facts and from the parties' proposed findings of fact which are not disputed. Citations to sources of quoted excerpts have been included even when those excerpts are undisputed.

principal, to try to set up programming and services so that Ron could succeed when he returned to the Shorewood School District. There were many incident reports reflecting occasions at Shorewood Intermediate School in the spring of the 2001-2002 school year when Ron was referred to Mr. Botbyl, the Dean of Students for behavior problems.

On March 28, 2002, Ron was referred for a special education evaluation under the IDEA. He met the criteria for specific learning disabilities. The district initially identified Ron as a child with a disability on May 23, 2002. Ron's Individualized Education Program (IEP) team developed an IEP and placement offer for him on June 5, 2002. The IEP addressed Ron's emotional needs, as well as organizational and visual processing deficits resulting from his learning disability.

The parents agreed to the IEP as developed by the team. The IEP included support from the staff in the learning disabilities program, a minimum of one period daily in the resource room, weekly consultation time between the general education and special education teachers and a meeting with Ron's high school teachers to discuss learning needs at the beginning of each semester. Other supplementary aids and services, including meetings with the guidance counselor and school psychologist to discuss emotional support, were part of the IEP. This IEP, which provided that Ron's placement was Shorewood High School, was effective from June 10, 2002, to June 9, 2003, and was his first IEP. The placement decision in this IEP provided that Ron would attend the school he would attend if he were not disabled.

On June 12, 2002, the plaintiffs consented to Ron's initial placement at Shorewood High School. They stated that they were "very pleased with the work of the [school psychologist] and the rest of the IEP team participants," and stated that the team process was handled in a "very professional and sensitive manner." (In the Matter of [student] v.

3

Shorewood School District, DHA Case No. LEA-03-008 (Wis. Div. Hearings & Appeals, June 30, 2003) (DPI)(Due Process Hearing [Hearing], Exh. 24).

While the district was conducting Ron's special education evaluation, his behavior and performance was "up and down," with "good days . . . and some days where he has a hard time." (Hearing Transcript [Tr.] 28). For example, Ron received disciplinary referrals for inappropriate and disrespectful language, spitting, tardiness, and, on one occasion, physically forcing his way into a classroom. He was suspended from school for one day on one occasion. Although Ron scratched his arm on his way to school once, he was never out of control, in a rage, crying and sobbing, nor did he require physical restraint at school.

Ron's language arts teacher, Nancy Ellis, reported that she did not have trouble with Ron in class during the 2001-02 school year. Ms. Ellis believes that she worked well with Ron because she would "really listen" to him, let him express his views appropriately, or allow him to step out in the hallway for a moment and then return to class. (Tr. 22, 33). Marci Margolis, his counselor, noted that staff effectively managed Ron's behavior during that time by talking with him in a calm voice, allowing him to gather his thoughts and express himself, and relating discussions with him to some of his core beliefs. Given the opportunity to talk with staff, such as Ms. Ellis, Ms. Margolis, or Kevin Gemignani, Ron's social studies teacher, "he would be okay." (Tr. 72).

By contrast, Ron's father, John Doe, testified that Ron would have "emotional meltdowns" at home in the spring of 2002. At home, Ron would precipitate a disagreement with one of his parents, and if the parent prohibited some behavior or imposed some restraint, his mood would spiral downward into rage and an emotional meltdown. These "meltdowns" at home began with "anger, then . . . despair," and then "sobbing." (Tr. 599-600). Mr. Doe testified that Ron would say that the world was terrible and there was no

4

point in living. On some occasions, those statements were accompanied by threats of suicide.

Mr. Doe testified that Ron sometimes would harm himself by scratching his arm until it bled or tying something around his neck until he turned purple in the face and choked. There were occasions where his parents had to physically restrain him at home and not let him leave because he threatened to go away and hurt himself. Mr. Doe further testified that he would have to physically restrain his son on the bed while Mrs. Doe attempted to contact Ron's therapist, Dr. Elizabeth [Betsy] Axelrod. Dr. Axelrod, a psychologist, worked in a psychologist/psychiatrist team with her husband, Dr. Bruce Axelrod, a psychiatrist.

According to Mr. Doe, Ron's psychiatrist, Dr. Bruce Axelrod, suspected Ron had an emerging thought disorder. Up to that point, the parents believed that they were simply dealing with a child who had serious behavior problems, with oppositional conduct and pent-up anger and attention issues. After meeting with Dr. Bruce Axelrod, they understood that Ron's disorder could be schizophrenia. Mr. and Mrs. Doe, however, did not share any of this information with the school district at that time.

As a result, during the summer of 2002, the plaintiffs enrolled Ron in a "therapeutic adventure program" in Idaho called ASCENT hoping that it would provide structured intervention to prepare him for the possibility of succeeding the next year in school. Mr. Doe testified that he and Mrs. Doe took Ron to ASCENT against his will because they believed it would save his life.

Shortly after arriving at ASCENT, Ron tied a cord around his neck and purposely tried to strangle himself. As a result of this suicide attempt, he was "put in a car with two large men who were escorting him" and taken away to a "hospital which was an hour or two away." (Tr. 606). Ron was immediately hospitalized in an acute care psychiatric unit. The

5

treating psychiatrist and the clinical psychologist in Idaho concluded that Ron was suffering a psychotic episode. Mr. Doe reported that he and Mrs. Doe were advised not to contact Ron while the hospital conducted a clinical evaluation of him. Mr. Doe described this period of time as "the worst 72 hours of our life." (Tr. 607). While Ron was in the youth acute unit at the hospital, he had to be physically restrained, strapped down to a gurney, and injected with a sedative. Ron was hospitalized from August 1 to August 14, 2002.

On August 12, 2002, Dr. George Ullrich met with the plaintiffs to discuss discharge plans. At that time, the plaintiffs concluded that they did not have adequate supports at home and agreed to "further medication management and residential placement." (Hearing, Exh. 40). After two weeks in the youth acute unit, Ron transferred to a nearby step-down, medical residential program in Idaho where he resided from August 14 to August 27, 2002.

Dr. Gary Stanton worked with Ron while he was in the youth acute unit and in the medical residential facility. Dr. Stanton concluded that Ron was suicidal, anxious and depressed, with paranoid thinking and stress induced psychosis. He identified Ron's primary needs as "being able to control himself, clear up his thinking, and be able to interact with peers and authority figures in an appropriate, acceptable way." (Tr. 755-56). Dr. Stanton specifically recommended that Ron be placed in a clinical program and not live at home because, despite their abilities, the plaintiffs could not effectively manage him and Ron "might turn to self harm." (Tr. 755). Dr. Stanton further believed that Ron needed a facility that could monitor his medication, build emotional support and assist Ron to think clearly and objectively. He stated that "a self-contained clinical program is clearly indicated". (Hearing, Exh. 18 at 17).

Drs. Stanton and Ullrich, both with North Idaho Behavioral Health, told the parents that Ron should not return to Shorewood High School. They confirmed that Ron was

suffering from schizo-affective disorder and that Ron's paranoia, reality testing deficits and anxiety were reactive to the stress of a highly structured behavioral environment, which was inappropriate and counterproductive for his illness.

After consulting with ASCENT staff on July 17, 2002, Ron's therapist, Dr. Betsy Axelrod, determined that Ron "will possibly need more treatment beyond this summer." (Hearing, Exh. 30). After further consultation with ASCENT staff, Dr. Axelrod discussed "long-term treatment" options with the plaintiffs. (Hearing, Exh. 31). Specifically, on July 25, 2002, Dr. Axelrod told the plaintiffs that she believed Ron needed an "around the clock intervention treatment school." Id. She explained that Ron's needs could not be addressed as an outpatient because "he wasn't safe," and that without treatment, the prognosis for his thought disorder was very poor. (Tr. 695-96). In particular, she recommended a "specialized type of treatment setting" with "24-hour care to keep [him] safe." (Tr. 698-701). On August 22, 2002, Dr. Axelrod talked with the plaintiffs again about treatment facilities, advising them of the "letters that would be needed . . . to get possible funding from the school system." (Hearing, Exh. 31).

On August 23, 2002, Mr. Doe contacted Debra Taylor, the Shorewood School District's Director of Instructional Services, "with the intent and purpose of giving her notice of the need to reopen the IEP." (Tr. 620). Mr. Doe informed Dr. Taylor that "there was an emergency" and described Ron's experience at ASCENT and in the hospital. Id. In that conversation, he also told her the nature of the emerging diagnosis of Ron's psychiatric illness and that Ron was suffering from depression with substantial thought disorganization that might be more serious than depression.

Dr. Taylor asked Mr. Doe if he had considered local options for Ron. Mr. Doe informed her that "none were suitable." (Tr. 621). Mr. Doe recalled telling Dr. Taylor that

Ron "needed to be in a therapeutic boarding room setting" and that the Sonia Shankman Orthogenic School[2] (Orthogenic School) in Chicago was "the most appropriate option" for Ron at that time. (Tr. 621-22). Mr. Doe indicated that the cost was astronomical. According to Mr. Doe, Dr. Taylor stated that the Shorewood School district had seldom or never done a placement out of state at district expense.

Mr. Doe indicated that he would provide authorization for Drs. Ullrich, Stanton, Axelrod and Zimmerman to provide more information to the Shorewood School District. Dr. Taylor affirmed that the Model Local Educational Agency (LEA) Special Education Policies and Procedures is the basis for the policies developed at Shorewood, including ensuring a continuum of alternative placement options, which would include special schools. Dr. Taylor, Dr. Arthur Anderson and Dr. John Linehan testified that none of them remembered ever placing a student in a residential setting.

The Orthogenic School is a self-described "residential treatment program" for adolescents who need support for behavioral or emotional issues. (Hearing, Exh. 102). It provides "intensive milieu therapy for students with disturbed emotions who are in residential care at the school." Id. In simpler terms, the facility "takes care of children with psychiatric illnesses." (Tr. 461). It is a boarding school that specializes in children who have psychiatric illnesses, although it is not a psychiatric hospital or medical facility.

The Orthogenic School does not accept day students. It is accredited by the North Central Association as a high school. Dr. Bennett Leventhal is the director of the school. He is a professor of psychiatry and pediatrics, the Irving B. Harris Professor of Child and

_____

[2]In its brief and proposed findings of fact, the defendant prefers to refer to the Sonia Shankman Orthogenic School as the "Residential Treatment Program." The plaintiffs object to the use of the phrase and affirmatively assert that the Sonia Shankman Orthogenic School is a "boarding school that specializes in children who have psychiatric illnesses." The court will use "Orthogenic School" in reference to the Sonia Shankman Orthogenic School.

Adolescent Psychiatry and the Director of Child and Adolescent Psychiatry at the University of Chicago.   Dr, Leventhal is a physician, but he does not have a degree or licensure in regular education, special education or education administration.

Mr. Doe testified:  "[Dr.] Taylor said she would convene the IEP after the teachers return after Labor Day.  She mentioned 9/3 or 9/4, and then finished the conversation with a statement to the effect that she and [Ron's] teachers will want to do what is best for [Ron]." (Tr. 622).  Dr. Taylor testified: "Mr. [Doe] requested that the School District set up an IEP meeting, and I mentioned to him, as that was very late in August, that we would do that as soon as school began as we would have all of the staff available." (Tr. 294).  She requested that Mr. Doe forward information to her about the summer's events and the difficulties that Ron had because "they seem to be very different from our experiences in terms of the severity of the issues that occurred."  Id.

On August 27, 2002, Ron's father and uncle took Ron from the medical residential unit in Idaho directly to Chicago, Illinois, for an interview at the Orthogenic School in order for him to be evaluated for possible admission.  According to Mr. Doe, Ron could not return to his parents' home in Shorewood because he could become "unmanageable" and would have "a huge meltdown crisis." (Tr. 616).  The plaintiffs also did not return Ron to Wisconsin because Ron's providers recommended against it.  One of the concerns was that Ron's parents "would have to sign him into a hospital and he would sign himself out," and Ron's providers recommended against it.  (Tr. 616-17).  After the interview, Mr. Doe and Ron stayed in a hotel room in Chicago for a week because the physicians advised the plaintiffs not to allow Ron to return home.

After she had received letters from Dr. Stanton and Dr. Axelrod about the fact that Ron should not return to Shorewood High School and/or home, Dr. Taylor contacted the

Orthogenic School to speak with them about the services that they were providing and also communicated Ron's IEP for the last year. She did not offer an alternative program to Ron while the IEP team was being convened.

Before the Orthogenic School accepted Ron on August 30, 2002, the plaintiffs provided the following records to the administrative staff: 1) records from Drs. Bruce and Betsy Axelrod, 2) records from the hospital medical treatment center in Idaho, and 3) school records that the parents had in their possession at the time.

To determine whether to admit a child into the program, the Orthogenic School reviews records, interviews the family, and applies the following criteria: 1) whether the child is one that the staff can handle safely; and 2) whether the child can benefit from its milieu model of treatment. The Orthogenic School accepted Ron and he was enrolled on September 5, 2002.

The program at the Orthogenic School uses the milieu model of treatment, which essentially creates a "comprehensive therapeutic environment" for patients. (Tr. 470). Dr. Leventhal described this model of treatment as taking "every element of the environment and [using] that as a therapeutic tool." Id.

> So whether it was your social interactions in what we would think of in the outside world as leisure time or interactions with teachers or doing homework, all of that was built into a comprehensive therapeutic environment and the therapeutic response, and that was the model that was created. We have carried it forward, modified it in modern times, but the basic model is that the environment is an essential part of the treatment. Then there is nothing in the environment that isn't included in the treatment. Shouldn't be, anyway.

Id. Dr. Leventhal noted, "I have 45 students and a staff of 110, and I can control everything in this kid's life if I need to or nothing if I need to, . . . it's the ability to control the entire environment all the time." (Tr. 571-72). During the 2002-03 school year, Ron had "someone

there 24 hours a day, physically present, standing or sitting at the door to his room, watching him and the group of kids in that room." (Tr. 547). Six staff members were physically present to assist him while he slept and other staff were available to be called in during the night, if necessary. Dorm counselors, teachers and therapists all use a common form that is then used by the mental health professionals to guide treatment decisions.

Ron required this level of supervision and care because his needs exceeded the resources available at his parents' home. Ron has been attending the Orthogenic School continuously since September 2002.

The Orthogenic School's Comprehensive Six Week Report for each student includes current progress and goals in four domains, the psychopharmacology regimen, individual therapy goals, academic goals and residential milieu goals. The teachers meet first thing every morning with the overnight staff, the school staff with the afternoon staff and so on, so that each team passes information from one part of the day and night to the next.

The program utilizes an Unusual Incident Reporting Form that follows the child through the day and is signed by a responsible person in each of the critical settings, whether the incident occurred in the school setting, in the dorm setting or after school in a recreational setting. (Tr. 500-502; Hearing Exh. 85). All incidents are discussed at staff meetings and daily adjustments are made to programming as a result of these incidents.

During the 2002-03 school year, Ron attended school, which included a varying schedule of academic classes interspersed with group and individual psychotherapy sessions, from 9:00 a.m. to 3:00 p.m. each day. He participated in extracurricular activities from 3:00 to 4:30 p.m. Staff observed Ron and would give him a letter grade rating for nearly every activity he participated in, 24 hours per day. For example, each and every day, Ron received a grade for waking up, dressing, performing chores, eating breakfast,

preparing for school, discussing his day, preparing for dinner, eating dinner, participating in dormitory activities, and sleeping. Over the course of the 2002-03 school year, program staff observed and graded Ron for having dinner with his parents, going to the mall, watching movies, going to Office Depot, going to Target, listening to headphones, taking a bath, going out for ice cream, purchasing "Halloween supplies" and participating in undefined "dormtime." In addition, as part of the treatment and included in the cost, Ron and his family received family therapy during parent visits.

When Ron first enrolled in the program in September of 2002, the staff developed an "individual psychotherapy treatment plan" for him. (Hearing Exh. 75). The report identified Ron's "major conflicts" as peer relationships, family relationships, lack of fully developed identity, intra-psychic chaos, gender identity and sexual orientation, and suicide attempts. Id. As a result, the treatment plan established several treatment goals, including reducing confusion in Ron's thought process, organizing his personal space, regulating his mood, reducing his feelings of depression, reducing violent or potentially violent outbursts, reducing his family tensions, helping him to more fully develop his self-concept, helping him to freely explore what type of person he will become, and helping him to successfully participate in home visits with his family.

Mr. Doe contacted Dr. Debra Taylor again after Ron was admitted to the Orthogenic School to inform her that Ron was enrolled. Shortly after her conversation with Mr. Doe, Dr. Taylor contacted Diana Cohen, principal of the Orthogenic School, to inquire about Ron's educational program in preparation for an IEP team meeting.

In a letter dated September 10, 2002, the plaintiffs' attorney, Susan Gramling, informed Dr. Taylor that the plaintiffs were "still in the process of obtaining the reports you have requested prior to setting up an IEP meeting." (Hearing, Exh. 88). Ms. Gramling also

notified Dr. Taylor that the plaintiffs placed Ron in the treatment program "in accordance with the advice and counsel of [Ron's] treating physicians and therapists." Id. Specifically, the plaintiffs consulted with Dr. Betsy Axelrod, Dr. Bruce Axelrod, Dr. Stanton, Dr. Ullrich, Mr. Doe's brother, a disabilities law attorney and Attorney Gramling. Ms. Gramling did not indicate that the plaintiffs consulted with an educator. During the hearing, Mr. Doe testified that he consulted an educator, but he remembers nothing more than the fact that she worked with Dr. Stanton and was female.

In a letter dated September 19, 2002, Ms. Gramling wrote to Dr. Taylor:

> As you requested I am sending you the information you requested from the team that treated [Ron] in Idaho. Dr. Gary Stanton, the psychologist that treated [Ron] has prepared a summary letter in addition to his psychologist's report. I understand that Dr. Axelrod has sent you a letter as well.
>
> Therefore, please schedule the IEP meeting to address [Ron's] current needs reflecting the changes that have occurred over the summer. [Ron's] parents have asked me to ask you to include Ms. Marci Margolis, the social worker at Shorewood Intermediate School on the team. Of course Dr. Axelrod and myself need to be present as well.
>
> Unfortunately, I am not available for a meeting all of next week, the 23rd through the 27th, as I will be working in Northern Minnesota the entire week. I will give all of my available times he week of September 30th, to Mr. [Doe] for coordination with your schedule, the [Doe's], Dr. Axelrod and myself.

(Hearing Exh. 88).

Upon receipt of the letters from Dr. Axelrod and Dr. Stanton, Dr. Taylor consulted members of Ron's IEP team, including Mr. Doe. The IEP team members agreed that additional testing would be necessary to determine whether Ron has an emotional behavioral disability. Dr. Taylor believed that although the team received information regarding Ron's medical and psychological diagnoses, it did not have sufficient information

13

regarding alleged changes in Ron's educational needs. A notice for reevaluation of the IEP was sent to the Does on October 7, 2002.

After Mr. Doe consented to testing, the district retained Dr. David J. Cipriano, a Ph.D., a psychologist in private practice, to conduct the evaluation. He evaluated Ron once for one and one-half hours on November 4, 2002. His diagnosis was depression, ADHD and oppositionality with a possible emerging conduct disorder. He found no evidence of a psychosis. On December 10, 2002, Dr. Cipriano submitted his evaluation report. The district reconvened Ron's IEP team on December 19, 2002. Throughout the IEP process, the findings and recommendations of Drs. Bruce and Betsey Axelrod, Stanton, Zimmerman and Leventhal were documented and provided to the district.

The IEP team, including the district's independent evaluator, met over three sessions, December 19, 2002, January 29, 2003 and February 6, 2003. The purpose of the IEP team meeting on December 19, 2002 was to determine whether Ron has an emotional behavioral disability, to review and revise his IEP, to develop a transition statement and to determine continuing placement. The team determined that Ron met the criteria for emotional/behavioral disability (EBD) and needed special education and related services for his EBD. Ron also continued to meet the criteria for Learning Disability (LD).

Pursuant to the plaintiffs' request, Dr. Axelrod, Ms. Gramling, and two representatives of the Orthogenic School attended the meeting. The IEP team reviewed information from Dr. Betsy Axelrod, the parents, the Orthogenic School, Dr. Gary Stanton, Dr. Cipriano, and district staff.

Drs. Leventhal, Betsy Axelrod and Stanton all later testified that a residential educational placement was necessary for Ron to benefit from educational programming. Dr. Leventhal testified:

14

It's my opinion that the only appropriate way that [Ron] could have been educated in the fall of 2002 and truly in the least restrictive environment was for him to be in a residential treatment program like ours. It didn't necessarily have to be ours, but one like ours.

\* \* \*

It's necessary for this child to learn for him to be in an intensive Milieu or in a residential treatment program. I don't think he can be learning in another setting.

(Tr. 539-40).

Dr. Betsy Axelrod testified:

I think both Dr. Stanton and myself as well as my husband felt that in order for [Ron] to make any progress academically, his emotional needs had to be clearly delineated and taken care of, that his emotional needs were so severe that he couldn't learn academically without being in a setting to keep him safe. [H]e needed a program that was much more highly based on social/emotional needs of children and a program with very sophisticated staff who understood the seriousness and the implications of the kinds of illness that [Ron] demonstrates.

(Tr. 698-700).

Dr. Stanton testified:

[Ron] needed more than just the academic instruction. We feel like he needed a program where he could practice skills that he – social skills that he learned, practice putting into effect methods of self-editing his political beliefs, practice in building and maintaining relationships with peers and with adults, and it's my belief that that needs to occur in a setting where he has more than just a school day. That needs to be a part of his life skills training.

(Tr. 756).

Dr. Betsy Axelrod opined that there are no treatment institutions in Milwaukee or even the state of Wisconsin that have the "support and intervention" to meet Ron's needs. (Hearing Exh. 20). She believed that Ron needed a "psychodynamic treatment center" because he would otherwise be a suicide risk. Id. She also stated that public school was

inappropriate because of "his level of psychotic depression, and constant risk for suicide." Id. Dr. Axelrod later opined that she and others set up the case for Ron's residential placement at that particular meeting. (Hearing Exh. 32).

The goals and objectives suggested by the Orthogenic School staff that were provided to the district addressed Ron's disorganization and irrational thinking, problems with peer relations, lack of acceptance of teacher redirection, difficulty with written work, work completion and organizational skills, inability to focus on work for extended periods of time, poor self esteem and lack of self motivation. The IEP team also reviewed Dr. Leventhal's October 30, 2002 correspondence "in support of efforts to secure funding to ensure the continued placement of Ron Doe at the Orthogenic School." (Hearing Exh. 20). In Dr. Leventhal's letter, he noted that Ron's treatment at the Orthogenic School is "augmented" by his academic program, therapy groups, and attention to medical needs. Id. In summary, Dr. Leventhal believed that the Orthogenic School's "comprehensive treatment program" provided Ron with "positive and supportive responses" to his special needs. Id.

Dr. Cipriano, the district's consultant, recommended an alternative, combining a day program with special education courses at Shorewood High School. Mrs. Doe stated that the plaintiffs would not agree to that placement. The district staff members of Ron's IEP team later concluded that Dr. Cipriano's recommended placement was appropriate for Ron, but rejected it based solely on the parents' objection. Given the plaintiffs' objection, the team continued to discuss the possibility of the district supporting the educational component of Ron's residential treatment program since the parents already had placed him at the Orthogenic School.

The IEP team's findings included, among other matters, that Ron demonstrated severe chronic and frequent behaviors, that they occurred at school and at least one other

16

setting and that he displayed an inability to develop or maintain satisfactory interpersonal relationships, an inappropriate affective or behavior response to a normal situation, pervasive unhappiness, depression or anxiety, inability to learn that cannot be explained by intellectual, sensory or health factors. The team also found that Ron demonstrated extreme withdrawal from social interaction and other inappropriate behaviors that are so different from children of similar age, ability, educational experiences and opportunities that the child or other children in a regular or special education program are negatively affected.

After meeting for three hours, the IEP team decided to reconvene to continue its discussion, with the agreement of the plaintiffs and Ms. Gramling. The plaintiffs consented to an extension of the timeline for reevaluation without objection, noting only that they were not waiving their claims to financial compensation. The IEP team continued its discussions regarding Ron's IEP and placement on January 29, 2003, and February 6, 2003. The district offered different placement options for the parents' consideration.

On February 6, 2003, Ron's IEP team offered Ron a special education placement for the 2002-03 school year. The first offer would have placed Ron at Shorewood High School for the full school day with a full-time aide. According to the placement, he would spend one-half day in general education class and one-half day in a resource room setting. The district would have contracted with a mental health provider to see Ron for two one-hour sessions per week in the school environment and to consult with school staff. The district's second offer was placement in a resource room setting one-half day with a half-time aide at Shorewood High School. Ron would then be transported to an unidentified day treatment program in the Milwaukee area for the other one-half day.

After rejecting other alternatives due to Mrs. Doe's continued objections, the IEP team offered the educational portion of Ron's treatment program at the Orthogenic School

because the parents had already selected and placed Ron in the residential treatment program for mental health reasons. The IEP team further concluded that the treatment program room and board were not necessary to make a free appropriate public education (FAPE) available to Ron.

Specifically, the district staff members of the IEP team determined that placement at the Orthogenic School was a response to Ron's psychiatric, social and emotional problems and that it was not necessary for educational purposes. The district concluded that the residential portion and the medical services were not considered appropriate related services for Ron. However, the team determined that two, one-hour sessions of individual therapy per week were educationally appropriate for Ron as a related service. As a result, the IEP team included therapy services on Ron's IEP. To ensure that the plaintiffs understood the district's commitment of resources, Dr. Taylor later informed them in writing that "the district will pay for the educational portion of Ron's program at the Sonia Shankman Orthogenic School for the 2002-03 school year. According to the Orthogenic School's estimate concerning education costs, this amount is approximately $23,000. (based on a daily rate of $122.05)."[3] (Hearing Exh. 94).

This second IEP, which was effective February 7, 2003 to February 6, 2004, provided that Ron would not attend the school he would attend if he were not disabled. The IEP provided that Ron needed a self-contained program to meet his IEP goals and the placement was at the Orthogenic School.

---

[3] The Orthogenic School has divided expenses into four categories: room and board, incidental, medical and dental, and educational tuition. The Orthogenic School charges educational tuition for each school day. Ron's therapy sessions (both the individual therapy required by the IEP and the weekly group therapy session) are included in his school day.

18

From that time through the due process hearing, the district received "comprehensive six-week reports" from the Orthogenic School to document Ron's progress toward his treatment and other goals. (Hearing Exhs. 76 and 77). Specifically, the reports assessed Ron's progress in the following areas: psychopharmacology regimen, individual therapy goals, academic goals and residential milieu goals.

An Orthogenic School report created immediately before the due process hearing provided additional information regarding Ron's functioning. According to Dr. Leventhal, the report contained two elements: 1) Ron's progress in school; and 2) "what we call the residential side of the program." (Tr. 487). He described the " residential side" as self-control issues, daily living skills, inner thought processes, mood regulation, and family relationships. (Tr. 487-88). The "residential side" of the report also discussed personal care, sexual impulses, identity formation and self-esteem, level of self-awareness, and relationships with counselors, therapists and peers. According to Dr. Leventhal, the psychiatric care that Ron receives "is intimately involved in his educational program and it is inherent in the evaluation as well as treatment." (Tr. 542).

Since his enrollment at the Orthogenic School, Ron has made significant progress both at home and at school. Specifically, during the 2003-04 academic year, Ron's psychosis dramatically improved, his organizational skills have improved, he has made significant improvements psychologically and in his ability to have social relationships, as well as improved academic performance. The number of unusual incidents reported between November 2003, and July 2004, the date of Dr. Leventhal's deposition, compared to the year prior, November 2002 to October 2003, was vastly reduced. In the recent period, four incidents were reported, one of which was an accidental injury to Ron that was not related to any misbehavior. In the prior year, there were multiple unusual incident reports.

19

Ron's academic records reflect significant progress, including consistent academic improvement, the acquisition of high school credits, the completion of high school courses and improved classroom behaviors and social skills.

The residential portion of the Orthogenic School costs the parents $192.79 per day, 365 days per year for a total of $70,369.35 per year. In addition, the cost of medication management is $250.00 per month, for a total of $3,000.00 per year.

## ANALYSIS

### Decision of the Administrative Law Judge

Plaintiffs John and Jane Doe, on behalf of their son, Ron, requested a due process hearing, pursuant to 20 U.S.C. § 1415(f), in a February 21, 2003, letter to the Wisconsin Department of Public Instruction (DPI), They asserted that the Shorewood School District failed to provide Ron with a free appropriate public education (FAPE) and identified the alleged violations of Ron's IDEA rights by the district.

Although the plaintiffs raised three issues in their February 24, 2003, due process hearing request, they withdrew two of the issues on March 20, 2003. Pursuant to their request Administrative Law Judge Sally M. Pederson took notice of the withdrawal of issues and stated that the sole remaining issue was: "Is the District responsible for payment of the cost of the Student's room and board and medical services incurred at the Sonia Shankman Orthogenic School from September 5, 2002 through August, 2003?" In the Matter of [student] v. Shorewood School District, DHA Case No. LEA-03-008 (Wis. Div. Hearings & Appeals, June 30, 2003) (DPI) [ALJ Decision], at 1.

ALJ Pederson conducted the due process hearing on May 6, 7, 8 and 15, 2003. She issued her decision on June 30, 2003. Id.

In her decision, ALJ Pederson examined the relevant evidence and applicable law. She observed that to identify an educational placement for purposes of parental reimbursement claims under the IDEA, the court of appeals for this circuit "has adopted a fact-driven approach." (ALJ Decision at 4) (citing Board of Educ. Of Community High Sch. No. 213 v. Illinois State Bd. Of Educ., 103 F.3d 545, 548 (7th Cir. 1996). She explained: "In determining whether a residential placement is covered by the IDEA, the 'analysis must focus on whether [the disabled child's] placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social or emotional problems that is necessary quite apart from the learning process.'" Id. (quoting Butler v. Evans, 225 F.3d 887, 893 [7th Cir. 2000]).

The ALJ discussed Robert H. v. Calumet County, 257 Wis. 2d 57, 653 N.W.2d 503 (2002), noting that the court had applied the Butler analysis to facts similar to those in the instant case. The issue in Roberts, as in the instant case, was whether the child's placement at a residential treatment facility was an educational placement under the IDEA that required it to be provided at no cost to the parents. The court held that the residential placement "was not necessitated by [the student's] educational needs for purposes of the IDEA." (ALJ Decision at 5) (quoting Robert H. at 510). ALJ Pederson concluded that the Wisconsin Supreme Court's reasoning and holding in Robert H. require the same result in this case.

In reaching her decision, she observed that Ron's parents unilaterally sought a residential placement in response to his "crisis and hospitalization during the summer and in reliance upon the advice of [Ron's} treating physicians and therapists." (ALJ Decision at 5). She specifically stated that the information provided by Dr. Betsy Axelrod and Dr. Stanton indicated that it was not Ron's special education needs that necessitated his

residential placement, "but rather his psychiatric and emotional problems that climaxed over the summer." Id. Thus, ALJ Pederson found that Ron's residential placement at the Orthogenic School "was necessitated by his psychiatric and emotional problems, not his educational needs." (ALJ Decision at 6). Accordingly, she concluded that Ron's placement "was not an educational placement for purposes of the IDEA, and the District is not responsible for the costs of his of his room and board" at the Orthogenic School from September 5, 2002, through August 2003. Id.

ALJ Pederson also rejected the plaintiffs' claim for medical expenses. She explained: "The law states that related services (which a school district must provide to a child with a disability as part of FAPE) include medical services, except that such medical services shall be for diagnostic and evaluation purposes only as may be required to assist a child with a disability to benefit from special education." (ALJ Decision at 6)(quoting 20 USC § 1401[22]), 34 CFR § 300.24[a]). She noted that medical services are further defined as "services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services." (ALJ Decision at 6 [citing 34 CFR § 300.24(b)(4)]).

ALJ Pederson determined that Ron's IEP did not include any medical expenses for diagnostic and evaluation purposes and that he already had been evaluated to determine whether he has a disability under the IDEA. Although the Orthogenic School monitors Ron's medication on a daily basis, she stated that this is not a medical service for evaluation purposes under the IDEA. She concluded that Ron "has not incurred medical expenses for diagnostic and evaluation purposes at the Orthogenic School that constitute related services for which the District is responsible under the IDEA." Id. Therefore, ALJ Pederson denied

the plaintiffs' claims for room, board and medical expenses at the Orthogenic School which were incurred from September 2002 through August 2003.

## Standard of Review

This court reviews the issue before it under a different standard of review from that governing a typical summary judgment motion. Heather S. by Kathy S. v. State of Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997). Although termed a "summary judgment," a district court's decision under § 1415(i)(2) should be based on a preponderance of the evidence standard. Id.

Any party aggrieved by the state administrative proceeding may bring a civil action in the federal district court or in a state court of competent jurisdiction. 20 U.S.C. §1415(i)(2)(A). The party challenging the outcome of the state administrative decision bears the burden of proof. Heather S., 125 F.3d at 1052; Board of Educ. of Community Cons. Sch. Dist. 21 v. Illinois State Bd. of Educ., 938 F.2d 712, 716 (7th Cir. 1991). In determining whether the challenging party has met that burden, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415 (i)(2)(B); see also, Alex R. ex rel Beth R. v. Forrestville Valley Comm. Unit School, 375 F.3d 603, 611 (7th Cir. 2004).

In this case, the court allowed the deposition testimony of Dr. Bennett Leventhal which was taken on July 26, 2004.[4] The order allowing the testimony limited it to providing

---

[4]Recognizing the desirability of allowing experts who testified at the administrative hearing to bring the court up to date on the child's progress from the time of the hearing to the trial, this court allowed the testimony of Dr. Leventhal with respect to Ron's updated academic and psychiatric progress at the school. Further, if Ron's current diagnosis had changed from the date of the administrative hearing, Dr. Leventhal was allowed to testify as to that diagnosis.

Case 2:03-cv-00743-PJG   Filed 09/28/05   Page 23 of 36   Document 52

the court with Ron's updated academic and psychiatric progress at the Orthogenic School. No additional evidence was submitted to this court.

In reviewing the administrative decision, the hearing officer is entitled to no deference on issues of law. Dale M. ex rel. Alice M. v. Board of Educ., 237 F.3d 813, 817 (7th Cir. 2001). "On issues of fact, however, the district court must accord 'due weight' to the decision of the hearing officer. Board of Educ. v. Rowley, 458 U.S. 176, 206 (1982). The rationale for this requirement is that, by mandating that district courts 'receive the records of the [state] administrative proceedings,' the statute implies that district courts must afford an appropriate level of deference--what the Supreme Court has styled as 'due weight'--to those proceedings. Id.; Alex R., 375 F.3d at 611-612.

Accordingly, on issues of fact, considerable deference is owed the administrative hearing officer when the court does not take new evidence, but relies solely on the administrative record. Alex R., 375 F.3d at 612. In such cases the level of review by the court is akin to one of clear error. Id. The court "may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.' " Id. (quoting School Dist. v. Z.S., 295 F.3d 671, 675 ( 7th Cir. 2002). Moreover, in Wisconsin, administrative law judges who hear IDEA cases are specialists and the court should not substitute its own notion of sound educational policy for those of school authorities whose decisions the court reviews. Todd v. Duneland School Corp., 299 F.3d 899, 904 (7th Cir. 2002) (citing Board of Educ. of Murphysboro v. Illinois Board of Educ., 41 F.3d 1162, 1167 [7th Cir. 1994]). However, in cases where the court hears new evidence, less weight is due the administrative record. Alex R., 375 F.3d at 612.

## ANALYSIS

The IDEA is "an ambitious federal effort to promote the education of handicapped children." <u>Rowley</u>, 458 US at 179. Its purpose is "to insure that all children with disabilities have available to them appropriate public education that emphasizes special education and related services designed to meet their unique needs." <u>Todd</u>, 299 F.3d at 901 (quoting 20 U.S.C. § 1400[d]).

The IDEA "grants federal financial assistance for the education of disabled children to all states that agree (as all have) to provide children with 'a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living.'" <u>Morton Community Unit Sch. Dist. No. 709 v. J.M.</u>, 152 F.3d 583, 584 (7th Cir. 1998) (quoting 20 U.S.C. § 1400[d][1][A]). The specific components of a student's free appropriate public education (FAPE) are established in the child's Individualized Education Program (IEP), which is reevaluated at least annually. 20 U.S.C. §§ 1400(d)(1)(A) and 1414(d). A student's IEP assesses his educational needs, identifies achievement goals, and specifies the special education and related services to be provided in furtherance of those goals. <u>Id.</u> The IDEA calls for a collaborative process between parents, teachers, and special education administrators in the development of a disabled child's IEP and the determination of his educational placement. 20 U.S.C. § 1414(d).

The Act contains a "mainstreaming" presumption, requiring disabled children to be educated in the least restrictive environment and in school with nondisabled students "to the maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A); <u>see also</u>, <u>Honig v. Doe</u>, 484 U.S. 305, 311 (1988); <u>Rowley</u>, 458 U.S. at 202-203. The IEP team's placement decision must be made in conformity with this statutory "least restrictive environment" requirement and

must ensure that "the child is educated in the school that he or she would attend if nondisabled," unless the child's educational program "requires some other arrangement." 34 C.F.R. §§ 300.552(a)(2), (c).

The IDEA specifically provides that local educational agencies are not required to pay for the education of a child enrolled in private school by his parents without the consent of or referral by the LEA. The IDEA provides in relevant part:

> This subchapter does not require a local educational agency to pay for the cost of education . . . of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

20 U.S.C. § 1412(a)(10)(C)(I). However, "a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii).

Courts have broad discretion under the IDEA to grant relief as deemed appropriate. 20 U.S.C. § 1415 (i)(2)(B)(iii); see also, School Committee of Burlington v. Dept. of Education, 471 U.S. 359, 369 (1985). Under this provision, "equitable considerations are relevant in fashioning relief." Burlington, 471 U.S. at 374.

With this background, the court will address the plaintiffs' claims. The plaintiffs ask this court to reverse the decision of the administrative law judge. They deny that Ron's placement at the Orthogenic School was for psychiatric/medical purposes with the educational component being merely incidental. Rather, the plaintiffs assert that the residential placement is educationally necessary. The plaintiffs maintain that the program at the Orthogenic School is the only program identified to date that meets Ron's educational needs and that his educational needs are nonseverable from the rest of the program at the

Orthogenic School. They further claim reimbursement for medical expenses incurred from September 2002 through August 2003.

The plaintiffs also seek a continuing remedy, namely, reimbursement of room and board and medical expenses incurred from August 2003 to the present. They request a declaratory judgment that the Shorewood School District continues to be responsible for Ron's room, board and medical expenses throughout his placement at the Orthogenic School.

The Shorewood School District asks this court to enter summary judgment in its favor. The defendant states that the issue before this court is whether the district is responsible for payment of the cost of Ron's room and board and medical services incurred at the Orthogenic School from September 5, 2002 through August, 2003. The defendant asserts that the IDEA does not permit the school district to fund Ron's room and board at the Orthogenic School because it is not an educational placement. It further maintains that the plaintiffs' have failed to exhaust their administrative remedies with respect to any claims after August 2003.

The question on review is whether the administrative law judge's decision that the Shorewood School District is not responsible under regulations promulgated under the IDEA for payment of the cost of Ron's room, board and medical services while at the Orthogenic School from September 5, 2002, through August, 2003, is contrary to the preponderance of the evidence. See, e.g., Heather S., 125 F.3d at 1052.

The IDEA regulation at issue, 34 C.F.R. § 300.302, provides:

> If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child.

What constitutes "education and related services" was addressed in Butler v. Evans, 225 F.3d 887 (7th Cir. 2000). In Butler, the court adopted the approach used in Clovis Unified Sch. Dist. v. California Office of Admin. Hearings, 903 F.2d 635 (9th Cir. 1990). In Clovis, the court explained that the "analysis must focus on whether [the disabled child's] placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process." Clovis, 903 F.2d at 643.

In applying this approach, the court in Butler determined that the student in that case had been admitted to a hospital almost entirely for medical reasons, rather than educational ones. Butler, 225 F.3d at 893. Due to a psychiatric crisis, her psychological needs took priority over her educational needs. Id. The hospital was not an accredited educational institution and did not provide residential placement for purposes of education. Id. a t 894.

In this case, ALJ Pederson applied this same approach and focused on the purpose of Ron's placement. In so doing, she also looked to the Wisconsin Supreme Court's application of Butler in Robert H., 257 Wis. 2d 57 Wis. 2002).

In Robert H., the student "was diagnosed with schizo-affective disorder, oppositional defiant disorder, and personality disorder with schizo-typal features." Robert H., 257 Wis. 2d at 60. Because of these mental health problems, his family was unable to care for him at home. Pursuant to a court order, Robert was placed in a residential treatment facility. Subsequently, Robert's IEP team convened and determined that Robert could function in a regular classroom with adequate support. However, the IEP team rejected this option because the court had ordered residential placement of Robert for his mental health issues. Robert's father claimed that Robert's residential placement should be at no cost to the parents. His request was denied.

28

On appeal, the court, citing Butler, stated that to determine whether a child's residential placement is reimbursable, the focus is on whether the placement is necessary for educational purposes. Robert H., 257 Wis 2d. at 69. The court denied reimbursement, concluding that Robert's residential placement was in response to his psychiatric problems and completely separate from his educational needs.

Here, ALJ Pederson noted the similarity of the facts in Robert H. and those presented in the instant case. She observed that Robert's court-ordered placement was in response to his parents' initiative and belief that he needed a residential placement. Although she acknowledged that the plaintiffs did not seek a court order for residential placement, Ron's parents "unilaterally sought a residential placement in response to [Ron's] 'crisis and hospitalization' during the summer and in reliance upon the advice of the Student's treating physicians and therapists." Id.

In reaching her conclusion, ALJ Pederson relied upon statements from Ron's treating doctors. She noted that Dr. Betsy Axelrod said Ron "is not a candidate for public school at this time because of his level of psychotic depression, and his constant risk for suicide." Id. Dr. Axelrod also recommended that Ron needed a "very specialized type of treatment setting." Id. (quoting Tr. 699). ALJ Pederson also cited Dr. Axelrod's opinion that no institutions in Milwaukee or Wisconsin would meet Ron's needs and that the Orthogenic School's intensive treatment program would provide him with needed "medication management, in-depth psychotherapy, and educational remediation." (ALJ Decision at 5).

ALJ Pederson found that Dr. Gary Stanton's testimony further supported her decision that it was not Ron's educational needs that necessitated the residential placement. In reaching this conclusion, she relied on his testimony that "[a]ttending school for six hours a day would certainly help him progress academically, but his primary needs are those of

29

being able to control himself, clear up his thinking, and be able to interact with peers and authority figures in an appropriate, acceptable way." Id.

ALJ Pederson weighed this information and concluded: "The Orthogenic School offers an academic program as part of its comprehensive milieu therapy, but the evidence presented clearly indicates that it was not the Student's special education needs that necessitated his residential placement there, but rather his psychiatric and emotional problems that climaxed over the summer." Id.

ALJ Pederson considered and rejected the plaintiffs argument that Ron's emotional and behavioral needs are "nonseverable from his educational needs," and therefore, that his placement is an educational placement under the IDEA. Id. She pointed out that the court of appeals for this circuit has not adopted the standard that where medical, social or emotional problems are intertwined with the educational problem, the cost of a residential placement is the responsibility of the school district. (ALJ Decision at 5.)

Rather, applying the standard set forth in Butler, ALJ Pederson concluded that Ron's placement at the Orthogenic School in September 2002, was clearly in response to medical, social, or emotional problems quite apart from his special education needs. According to ALJ Pederson: "The comprehensive therapeutic program offered at the Orthogenic School certainly may be the best place to meet all of the Student's various psychiatric, emotional and educational needs, but that does not mean that the district is responsible under the IDEA for the cost of the Student's non-educational residential placement there." Id. at 6.

This court has carefully reviewed the administrative law judge's assessment of the facts. The undisputed relevant facts demonstrate that the ALJ properly concluded that Ron's placement at the Orthogenic School was in response to a psychological crisis. Mr. Doe called it an "emergency" and stated that the placement was necessary to keep Ron

30

safe. (Tr. 620). At the time, according to Dr. Stanton, Ron was suicidal, anxious and depressed, with paranoid thinking and stress induced psychosis. The undisputed facts demonstrate that Ron needed an "integrated program" which would address his "primary needs." (Tr. 755). The treatment goals were geared to meeting his primary needs, including reducing confusion in Ron's thought process, helping him to control himself and reduce violent or potentially violent outbursts, reducing his feelings of depression and helping him to interact with peers and authority figures in an acceptable manner. See Tr. 755-56. The ALJ's conclusion is amply supported by the evidence of record.

The administrative law judge also properly applied the applicable law. She focused on whether Ron's placement could be considered necessary for educational purposes or whether the placement was a necessary response to medical, social, or emotional problems that is necessary "quite apart from the learning process." Butler, 225 F.3d at 893 (quoting Clovis, 903 F.2d at 643). Like the student in Butler, the court concludes that Ron's acute psychological condition demanded prompt medical intervention and took precedence over his educational needs.

The plaintiffs distinguish Butler in part because the facility where the student was placed in that case was a hospital, not a school. The Orthogenic School is an educational facility. Although the type of placements differed, the court in Butler clearly delineated that the focus must remain on the purpose of the placement. The undisputed facts demonstrate that the primary purpose of Ron's placement at the Orthogenic School was his psychiatric and emotional problems which occurred during the summer. It was not focused on his educational needs.

ALJ Pederson properly concluded that Ron's 2002-2003 placement was unilateral and in response to medical, social, or emotional problems quite apart from the learning

process. This determination is supported by the undisputed facts before the court. Accordingly, this court concludes that the plaintiffs have failed to meet their burden of showing by a preponderance of the evidence that the Shorewood School District is responsible, under regulations promulgated under the IDEA, for payment of the cost of Ron's room and board while at the Orthogenic School from September 5, 2002 through August, 2003.

The plaintiffs also seek reimbursement for medical expenses in the form of medication monitoring, which they incurred from September 5, 2002, through the entire time of Ron's placement at the Orthogenic School. The plaintiffs contend that medication monitoring should be included as a related service.[5] The plaintiffs acknowledge that medical services are not related services under the law unless they are evaluative in nature. However, they maintain that "Ron's medication management is, in essence, evaluative in nature, as it is intended to monitor the effects of the medications and whether they are effective in controlling Ron's psychosis." (Plaintiffs Brief in Support of Summary Judgment at 21 [Plaintiff's Brief]).

ALJ Pederson disagreed with the plaintiffs' position. She noted that Ron already had been evaluated for purposes of determining whether he has a disability under the IDEA. She referenced Dr. Leventhal's testimony that "[e]very time we see [the Student] it's an evaluation . . . and [w]e are constantly trying to assess the safety and efficacy of this treatment." Accordingly, ALJ Pederson stated: "I do not believe the IDEA includes the type of daily monitoring of medication as a medical service for evaluation purposes, as defined by the IDEA." (ALJ Decision at 6).

_____

[5] Ron's IEP team determined that two, one-hour therapy session per week were educationally appropriate for Ron as a related service. As a result, the IEP team included these therapy services on Ron's IEP.

In determining what constitutes "related services," "[t]he essential distinction is between services primarily oriented toward enabling a disabled child to obtain an education and services oriented more toward enabling the child to engage in noneducational activities. Dale M., 237 F.3d at 817, citing Butler, 225 F.3d at 894. The court in Dale M., explained: "The former are 'related services' within the meaning of the statute, the latter not." Id. at 817. In discussing related services, the court in Butler held that inpatient medical care in that case was necessary in and of itself, and was not made necessary to allow the student to receive an education. As a result, the court held that the IDEA did not require payment for all additional services necessitated by the student's disability, except those that are for "diagnostic and evaluation purposes". Butler, 225 F.3d at 894-895, (quoting 20 U.S.C. § 1401(22).

In this case, Ron was evaluated and determined to be a child with a disability under the IDEA on May 23, 2002. Although there may be instances where medication management could be considered a medical service under the Act, the plaintiffs have not shown by a preponderance of the evidence that Ron's medication management is for educational needs, as opposed to behavioral management. The ALJ's decision denying the plaintiffs' claim for medical expense reimbursement for medication management is supported by the evidence. Accordingly, the plaintiffs' request for reimbursement of medication monitoring costs is denied.

### Request For Declaratory Judgment

This case involves review of the ALJ's decision regarding the 2002-2003 school year. The plaintiffs also seek a declaratory judgment declaring that the Shorewood School District continues to be responsible for Ron's room, board and medical expenses throughout his placement at the Orthogenic School. The plaintiffs did not raise this claim before the

administrative law judge.  Nevertheless, the plaintiffs maintain that a continuing remedy should be allowed until or unless there is a change in circumstances that would make additional administrative proceedings appropriate

The defendant opposes the plaintiff's request, asserting that the plaintiffs have failed to exhaust their administrative remedies as required by the IDEA.  The defendant asserts that the plaintiffs must exhaust their administrative remedies as to each academic year in question.

In cases where a plaintiff alleges injuries that could be redressed by the IDEA's administrative procedures and remedies, courts should require exhaustion of administrative remedies.  McCormick v. Waukegan Sch. Dist. # 60, 374 F.3d 564, 568 (7th Cir. 2004) (citing Robb v. Bethel Sch. Dist., 308 F.3d 1047, 1054 [9th Cir. 2002]); see also, 20 U.S.C. § 1415(l).  However, if the injuries cannot be redressed by the administrative process, then exhaustion would be futile or inadequate, and exhaustion is not required.  Honig, 484 U.S. at 327; see also, McCormick, 374 F.3d at 568.

In McCormick, the student suffered from a rare form of muscular dystrophy known as McArdle's Disease.  Even though the physical education teacher knew of the student's limitations, she made him perform strenuous physical exercises which had devastating impacts on his physical health.   In that case, the court concluded that exhausting administrative remedies was futile because the IDEA did not provide a remedy for the injuries at issue, which were non-educational in nature.  Id.; see also, Padilla v. Sch. Dist. No. 1, 233 F.3d 1268, 1274-75 (10th Cir. 2000) (holding that a disabled student who suffered a fractured skull and exacerbation of a seizure disorder when she was placed in an unsupervised windowless closet did not need to exhaust because the claim was brought "solely to redress" the physical injuries and was outside of the scope of IDEA); Witte v. Clark

County Sch. Dist., 197 F.3d 1271, 1275-76 (9th Cir. 1999) (holding exhaustion to be unnecessary and pointing to physical abuse and injuries and the lack of possible remedies under IDEA's administrative processes that could address the plaintiff's damages).

These cases involved situations where IDEA's administrative processes could not remedy the injuries. The facts of this case are clearly distinguishable. Here, the administrative processes and remedies are available to the plaintiffs and there is no indication that they would be futile or inadequate.

As noted, the IDEA contemplates an annual review of a student's progress. The IEP is a written statement developed for *each school year*. (Emphasis supplied). See 20 U.S.C. § 1414(d); Brown v. Bartholomew Consol. Sch. Corp., 2005 WL 552194 (S.D. Ind. 2005). A child's educational abilities, annual and short-term goals for improvement, and the individualized instructional methods and services necessary to achieve those goals may vary from academic year to academic year. In fact, according to Dr. Leventhal, Ron made substantial progress during the 2003-2004 academic year at the Orthogenic School. Dr. Leventhal provided supplemental information in which he indicated that Ron has made significant improvements psychologically, socially and academically since August 2003.

The court has carefully considered the plaintiffs' request and the applicable law. Such consideration causes this court to conclude that the plaintiffs have not established that exhaustion of administrative remedies would be futile or inadequate as to any subsequent academic year that Ron has been attending the Orthogenic School. Accordingly, the request for declaratory relief is denied.

The court is not unsympathetic to the Does' serious concerns and significant efforts to obtain an appropriate education for their son, Ron. However, based on its review of the administrative record and the submissions of the parties, the court concludes that the ALJ's

35

decision is supported by the record. In sum, this court concludes that the plaintiffs have failed to demonstrate by a preponderance of the evidence that the Shorewood School District should be responsible for payment of the cost of Ron's room and board and medical services incurred at the Sonia Shankman Orthogenic School from September 5, 2002 through August, 2003. The court further concludes that Ron's placement at the Orthogenic School in late summer 2002 was a response to medical, social, or emotional problems that was necessary quite apart from the learning process. See Butler, 225 F.3d at 893. Moreover, Ron's medication management is not diagnostic or evaluative in nature but rather related to behavioral management. Finally, the record does not support the conclusion that exhaustion of remedies in regard to future academic years would be futile or inadequate.

In light of the foregoing, the defendant's motion for summary judgment will be granted. The plaintiffs' motion for summary judgment will be denied.

## CONCLUSION

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment (Docket # 39) be and hereby is **granted.**

**IT IS ALSO ORDERED**, that the plaintiff's motion for summary judgment (Docket # 34) be and hereby is **denied.**

**IT IS FURTHER ORDERED** that the clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 28th day of September, 2005.

BY THE COURT:

s/Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge

O:\CIV\Shorewood Decision & Order.wpd

36